# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KEYME, LLC, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 19-1539-LPS |
| THE HILLMAN GROUP, INC., | : | |
| Defendant. | : | |

Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Sean S. Pak, Jeff Nardinelli, and Zachary Flood, QUINN EMANUEL URQUHART & SULLIVAN, LLP, San Francisco, CA

David A. Nelson, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Chicago, IL

Thomas D. Pease, Eric Hui-chieh Huang, and Sean Gloth, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, NY

    Attorneys for Plaintiff


Michael P. Kelly, Daniel M. Silver, and Alexandra M. Joyce, MCCARTER & ENGLISH, LLP, Wilmington, DE

Christopher P. Issac and Ryan P. O'Quinn, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Reston, VA

John M. Williamson and Cara E. Regan, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, DC

    Attorneys for Defendant

**MEMORANDUM OPINION**

January 25, 2021
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court are the parties' claim construction disputes related to terms in U.S. Patent No. 8,682,468 (the "'468 patent"). The parties submitted a joint claim construction brief (D.I. 53), exhibits (D.I. 53-1, 53-2), and tutorials (D.I. 44, 45). The Court held a claim construction hearing on November 24, 2020, at which both sides presented oral argument. (D.I. 75) ("Tr.")

## I. LEGAL STANDARDS

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325-26 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal citation and quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art [POSA] in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

1

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide. . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (alteration in original) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir.

2

1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In some cases . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously

3

describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks omitted).

## II.    CONSTRUCTION OF DISPUTED TERMS

### A.    "kiosk"[1]

| **KeyMe** |
|---|
| Plain meaning |
| **Hillman** |
| "a self-service, free-standing device for deployment on a retail floor" |
| **Court** |
| "a device that has a self-contained structure housing the hardware components, which allows for key duplication without assistance from a skilled locksmith" |

KeyMe contends that the term "kiosk" is easily understood in the claims' context and should be given its plain meaning. (*See* D.I. 53 at 4) In the Court's view, however, construction is necessary because the parties have a material dispute regarding the proper scope of the term. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

The specification does not define "kiosk" and provides only an exemplary description of it as a location in which hardware components can be arranged. (*See* '468 patent at 3:53-56) The parties appear to agree that the claimed "kiosk" must be a structure with at least a certain degree of self-containment. (*See* Tr. at 33) ("[I]f we have a situation where the key cutting or

---

[1] This term appears in claims 1, 16, and 19 of the '468 patent.

4

shaping was done . . . five miles away [from the screen], . . . that probably doesn't work.") Without further guidance from the intrinsic evidence, the Court has also consulted the dictionary definitions submitted by the parties,[2] *see Phillips*, 415 F.3d at 1318, and finds that the term "kiosk" should be construed as a device having a self-contained structure that houses its hardware components.[3]

The Court agrees with Hillman that the construction should reflect the stated purposes of the invention. *See generally Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1352 (Fed. Cir. 2020) ("A patent's statement of the described invention's purpose informs the proper construction of claim terms."). The specification observes that "[t]here is a need for mechanisms for duplicating keys that do not require the services of a skilled locksmith," and describes the invented systems and methods as "allow[ing] a user to obtain a duplicate key in a self-service fashion without assistance from, for example, a skilled locksmith or an employee at a hardware store that duplicates keys." ('468 patent at 1:44-46, 3:38-41; *see also* Tr. at 15-17, 30-31 (KeyMe agreeing to inclusion of some limitation relating to capability of key duplication without necessity of skilled locksmith))

---

[2] The parties have provided the following dictionary definitions of "kiosk:" "a small stand-alone device providing information and services on a computer screen" (Marriam-Webster Online Dictionary, D.I. 53-1 Ex. 1); "a small stand containing a computer that people can walk up to and use to retrieve information" (Barron's Dictionary of Computer and Internet Terms (11th ed.), D.I. 53-2 Ex. 1); "a small open-fronted hut or cubicle used as a shop or for displaying information" (Concise Oxford English Dictionary (12th ed.), D.I. 53-2 Ex. 2).

[3] The Court's construction only requires the "kiosk" to house its hardware components in a self-contained structure. It does not prevent the "kiosk" from accessing network communications or receiving key blanks supplied by the user, features which are specifically described in the patent as potential embodiments. (*See* Tr. at 32-33; *see also* '468 patent at 4:46-55, 7:65-8:20)

5

Hillman has not persuaded the Court that its proposed limitation of "for deployment on a retail floor" is appropriate. Reference to a retail location appears in only a single embodiment disclosed in the specification. (*See* '468 patent at 8:4-9) It would be improper to read this limitation into the claims. *See Liebel-Flarsheim*, 358 F.3d at 913.

The Court also rejects Hillman's requirement that the "kiosk" be "free-standing." Embodiments in the specification reference a "limited footprint" ('468 patent at 5:65-6:3) but the Court sees nothing that expressly excludes from the scope of the claims embodiments which are "bolt[ed] . . . to the wall" (Tr. at 12) and have no footprint. Whether an alleged "kiosk" is sufficiently detached from other structures to constitute a "kiosk" is more properly viewed as a fact dispute than a matter for claim construction.[4]

### B. "security information"[5]

| KeyMe |
|---|
| Plain meaning |
| **Hillman** |
| "unique information that is personal to a user" |
| **Court** |
| "information that is used for security" |

Construction of this term is necessary. *See O2 Micro*, 521 F.3d at 1361. The Court adopts the construction proposed by KeyMe at the hearing (*see* Tr. at 47-48), which is supported by the specification. The specification explains that "any suitable security mechanisms can be

---

[4] The parties agree that a connection between an alleged kiosk and the internet (e.g., through a communications network) does not necessarily deprive that device of the characteristic of being "free-standing." (*See* Tr. at 7-8, 26-27) Hillman suggests that this is so only if the communications are for "reasons unrelated to the invention." (*See id.* at 27) The Court views this as a possible subset of the factual disputes the parties may have going forward with respect to "how free-standing" a device must be to be viewed as a kiosk by a POSA.

[5] This term appears in claims 1, 16, 19, and 34 of the '468 patent.

6

included . . . to prevent unauthorized key duplication" ('468 patent at 3:32-34), and discloses multiple embodiments in which the "security information" is used for security purposes during the process of key duplication (*see, e.g., id.* at 3:42-45 ("[T]he systems and methods can be used to verify user identification through biometric scanning to provide a secure method for duplicating sensitive keys, . . . ."), *id.* at 10:33-37 ("[T]his information can be received to securely identify the user and/or the key.")).

Hillman's proposed construction imports unjustified limitations into the claims. (*See* D.I. 53 at 17) The specification does not define "security information;" nor does it contain any express limitation on the scope of the term. Instead, the specification differentiates "security information" from "user information" by way of enumerated examples.[6] (*See* '468 patent at 9:12-16, 9:24-27; *see also id.*, cl. 6) Contrary to Hillman's proposed construction, nothing in the patent requires that the claimed "security information" be "unique" (multiple users could have the same password, for example) or even "personal to the user" (for instance, users can authorize others to access their key information, *see id.* at 13:34-36). The Court agrees with KeyMe that there is overlap between what a POSA would consider to be security information and what she would consider to be user information. (*See* Tr. at 46-48)

---

[6] The specification's examples of "user information" include a user name, a key name, a user's physical address, a user phone number, a user credit card number, a user identification number (e.g., social security number, driver's license number, passport number, etc.), and a user email address. ('468 patent at 9:12-16) Its examples of "security information" include a user password, a user spoken word, a user fingerprint scan, a user retina or iris scan, a face image, a DNA sample, a palm print, and a hand geometry measurement. (*Id.* at 9:24-27) Claim 6 identifies the following examples of security information: a username, a password, biometric information of the user, a barcode, a Quick Response code, a radio signal encoded with account information, and a light signal encoded with account information.

7

C. "[first/second] identifying information based on the [first/second] security information"[7] / "[first/second] identifying information identifying a [first/second] particular user based on the [first/second] security information"[8] / "third identifying information based on fifth security information identifying a third particular user"[9]

| KeyMe |
|---|
| Plain meaning |
| **Hillman** |
| "[first/second/third] information that identifies a [first/second/third] user and is derived from, but not identical to, the [first/second/fifth] security information" |
| **Court** |
| "[first/second] information that identifies a user or a key and is based on the [first/second] security information" / "[first/second] information that identifies a [first/second] user and is based on the [first/second] security information" / "third information that identifies a third user and is based on the fifth security information" |

The parties' dispute focuses on whether the identifying information, which is to be stored at a storage device, needs to be different from the security information received from the user. The Court agrees with KeyMe that it need not.

The specification describes two embodiments in which the identifying information is modified based on the security information received from the user. (*See* '468 patent at 9:47-49 (encrypted security information); *id.* at 10:11-16 (unique number generated based on security information)) However, there is no requirement in the specification that the identifying information must be different from the received security information. In fact, the identifying information can be the security information itself (*see id.* cl. 1) ("receives first security information specified by a first particular user and *identifying the first particular user*") (emphasis added), and can thus be "stored in any suitable manner and at any suitable location"

---

[7] This term appears in claims 1, 19, and 34 of the '468 patent.

[8] This term appears in claims 16 and 34 of the '468 patent.

[9] This term appears in claims 14 and 32 of the '468 patent.

8

(*see id.* at 9:37-39). Hillman's proposed construction improperly reads a limitation from the embodiments into the claims. *See Liebel-Flarsheim*, 358 F.3d at 913. Hillman's conclusory contention that "if A is used as a basis for B, A and B are not identical" is also unpersuasive, for reasons including the examples in the patent "in which the identifying information is both identical and non-identical to the received security information." (*See* D.I. 53 at 33-34) (citing examples)

With respect to the disputed term appearing in claims 1, 19, and 34, KeyMe further contends that the "identifying information" is not restricted to, as Hillman proposes, the information that identifies a user. (*See id.* at 28) Rather, according to KeyMe, the "identifying information" can also identify a key. (*See id.*) The Court agrees with KeyMe because the specification expressly discloses an embodiment in which a unique number that anonymously identifies a key can be generated by using the security information received from a user. (*See* '468 patent at 10:11-16) The Court's construction captures this embodiment.

### D. "automatically [determines/determining] bit heights of the first key based on the [captured/second] geometric information about the second key"[10]

| KeyMe |
|---|
| "automatically determines bit heights of the second key based on the captured geometric information about the second key" |
| **Hillman** |
| Plain and ordinary meaning |
| **Court** |
| "automatically [determines/determining] bit heights of the second key based on the [captured/second] geometric information about the second key" |

KeyMe's construction is intended to correct what it contends is a typographical error in the claim term. (*See* D.I. 53 at 36) Hillman counters that KeyMe should not be allowed to

---

[10] This term appears in claims 1 and 19 of the '468 patent.

9

"rewrite its claims under the guise of a 'correction.'" (*See id.* at 39) The Court agrees with KeyMe that there is an obvious typographical error in the claim term, which the Court may correct, and, accordingly, adopts what is essentially KeyMe's proposed construction to correct it.

A district court may correct an obvious error in a patent claim "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (quoting *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)). Both requirements are satisfied here.[11]

The correction is not subject to reasonable debate. The specification does not teach determining the bit heights for the *first* key using geometric information from the *second* key scanned at the kiosk.[12] (*See* D.I. 53 at 38) It does, however, teach determining the bit heights for the *second* key using geometric information from the *second* key (i.e., the same key) scanned at the kiosk. (*See* '468 patent at 8:55-60, 9:31-36, 13:14-25) A POSA would understand it makes no sense to determine the bit heights of the first key based on the captured geometric information

---

[11] At the hearing, Hillman argued that, under *Novo*, the Court could only correct "minor" typographical and clerical errors, whereas "major" errors, like the one Hillman suggests is present here, may be corrected only by the patent office. (*See* Tr. at 65; *see also Novo*, 350 F.3d at 1357) *Novo* did not provide a separate test for "minor" and "major" errors; instead, it set out the two-step test the Court is applying here. Nor did the subsequent Federal Circuit decision in *CBT Flint* discuss a distinction between "minor" and "major" errors.

[12] Hillman contends that the claims as written are consistent with the specification, which "contemplates situations where a key may be copied using geometric information about keys other than the key being scanned." (D.I. 53 at 40; *see also* '468 patent at 10:66-11:16) This argument is unpersuasive. The cited portion of the specification describes correcting flawed keys by using the "factory specification;" nothing in the patent specification suggests that the "factory specification" refers to the geometric information about a second key *captured by the key scanner at the kiosk*, which is what is required by the claim language.

10

about the second key, especially as the bit heights of the first key have already been determined from the information about the first key itself. (*See* D.I. 53 at 38; *see also, e.g.*, '468 patent, cl. 1 ("automatically determines bit heights of the first key based on the captured geometric information about the first key"))

The prosecution history does not suggest a different interpretation of the claim term, either. The disputed claim term was added during the prosecution of the '468 patent, but neither the patentee nor the Examiner specifically addressed its interpretation. (*See* D.I. 43 Exs. E and F) The Court is persuaded that the claim term contains a typographical error which it can, and should, correct.

    E.    "[receives/receiving . . .] [third/fourth] security information, wherein the [third/fourth] security information corresponds to the [first/second] identifying information but not the [second/third/first] identifying information"[13] / "[receive/receiving . . .] sixth security information that corresponds to the third identifying information but not to the first identifying information and not to the second identifying information"[14]

| KeyMe |
|---|
| Plain meaning |
| **Hillman** |
| "[receives/receiving . . ./receive] security information and [recognizes/recognizing/recognize] that information as corresponding to certain identifying information but not other identifying information" |
| **Court** |
| "[receives/receiving . . ./receive] security information that corresponds to certain identifying information but not other identifying information" |

The parties' dispute centers on whether, in addition to the "receiving" step, the claims also require a separate "recognizing" step. The Court agrees with KeyMe that they do not.

---

[13] This term appears in claims 1, 16, 19, and 34 of the '468 patent.

[14] This term appears in claims 14 and 32 of the '468 patent.

11

Neither the plain meaning of the claim language nor the specification supports reading a "recognizing" step into the claims. In the context of the received security information, the patent only discloses the verification step, and not a separate recognition step. (*See* '468 patent at 3:42-45) Moreover, the claims recite in a ***different*** clause a step that "verifies" that the security information corresponds to identifying information, rendering the proposed recognition requirement redundant. (*See, e.g., id.*, cl. 1) ("verifies that the third security information corresponds to the first identifying information") The Court is not persuaded by Hillman's contention that the claim term "but not the [second/first] identifying information" is meaningless without the proposed recognition step (*see* D.I. 53 at 49), because that claim term limits the characteristic of the received security information, regardless of whether the processor actively recognizes that characteristic.

F. "[identifies/identifying . . .] [first/second] stored geometric information . . . , wherein the [first/second] stored geometric information includes the [first/second] geometric information but does not include the [second/first] geometric information"[15]

| **KeyMe** |
|---|
| Plain meaning |
| **Hillman** |
| "[identifies/identifying . . .] [first/second] stored geometric information . . . and recognizes that information as including certain geometric information but not other geometric information" |
| **Court** |
| "[identifies/identifying . . .] [first/second] stored geometric information . . . , which includes the [first/second] geometric information but not the [second/first] geometric information" |

For the same reason given above in connection with the previous claim term, the Court rejects Hillman's proposed construction, which reads a recognition step into the claims.

---

[15] This term appears in claims 1, 16, 19, and 34 of the '468 patent.

12

G. **"[verifies/verify/verifying/the verification] that the [third/fourth/sixth] security information corresponds to the [first/second/third] identifying information"**[16]

| KeyMe |
|---|
| Plain meaning |
| **Hillman** |
| "[confirms/confirm/confirming/the confirmation] that the [third/fourth/sixth] security information is associated with the [first/second/third] identifying information" |
| **Court** |
| No construction necessary |

The parties agree that "verify" and "confirm" are synonymous. (*See* D.I. 53 at 58, 61; *see also* Tr. at 91-92) At the hearing, Hillman also agreed that "corresponds to" is synonymous with "is associated with" and would be agreeable to a construction which retained "corresponds to." (*See* Tr. at 93) The only remaining dispute as to the scope of this claim term, if any, appears to be Hillman's suggestion that "verify" implies a "secondary" "confirmatory" step "after the initial recognition" step. (*See id.* at 92) But the Court has already rejected Hillman's contention that a separate recognition step is to be read into the claims beyond what is required by the verification step (*see* above) and does so again. It follows that no construction is necessary.

H. **"a [first/second] key shaping device that creates a [third/fourth] key using the [first/second] geometric information, including the key type of the [first/second] key and the bit heights of the [first/second] key"**[17] / **"a [first/second] key shaping device that creates a [third/fourth] key based on the [first/second] geometric information, including the [first/second] key type and the [first/second] bit heights"**[18] / **"creating a [third/fourth] key using the [first/second] geometric information, including the key type of the [first/second] key and the bit heights of the [first/second] key"**[19]

---

[16] This term appears in claims 1, 14, 16, 19, 32, and 34 of the '468 patent.

[17] This term appears in claim 1 of the '468 patent.

[18] This term appears in claim 16 of the '468 patent.

[19] This term appears in claims 19 and 34 of the '468 patent.

13

| |
|---|
| **KeyMe** <br> Plain meaning |
| **Hillman** <br> "a device that creates a duplicate key by shaping material to replicate the key type and the bit heights" / "a device that creates a duplicate key by shaping material to replicate the key type and the bit heights" / "creating a duplicate key by shaping material to replicate the key type and the bit heights" |
| **Court** <br> "a [first/second] device that duplicates a [third/fourth] key using the [first/second] geometric information, including the key type and the bit heights, of the [first/second] key" / "a [first/second] device that duplicates a [third/fourth] key based on the [first/second] geometric information, including the key type and the bit heights, of the [first/second] key" / "duplicating a [third/fourth] key using the [first/second] geometric information, including the key type and the bit heights, of the [first/second] key" |

The parties dispute whether the claims encompass the key cutter disclosed in the specification that duplicates keys by cutting the bitting pattern using inventoried key blanks. (*See* '468 patent at 5:5-8:20) The Court agrees with KeyMe that the disputed claim terms should cover that embodiment. *See EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) ("A claim construction that excludes a preferred embodiment . . . is rarely, if ever correct and would require highly persuasive evidentiary support.").

Hillman's argument that the key cutter should be excluded because duplicating keys from inventoried blanks is described in the specification as "cutting," not "shaping," is unpersuasive. (*See* D.I. 53 at 65-66) The term "key shaping device" is not defined in the specification and there is no indication that the "key shaping device" cannot duplicate keys by "cutting." The cases cited by Hillman to support its position are distinguishable.[20] Hillman's reference to the

---

[20] The claim constructions in *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016), and *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009) did not exclude embodiments from claims. In *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1324, 1334-35 (Fed. Cir. 2010), the Court found it was unreasonable to construe the term "translated forward" to cover an embodiment in which the movement was toward the circumferential direction, because these two directions were "at right angles to each other." No comparable situation is present here.

14

prosecution history is also unavailing (*see id.* at 67), because "it is well settled . . . that it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1124 (Fed. Cir. 2004).

Hillman's argument that the key cutter using inventoried key blanks "does not *create* a new key *using* the stored key type" also lacks merit. (*See* D.I. 53 at 66) The claims only require the device to create a key and do not require it to create a key type from scratch. The key cutter needs to receive a key blank of the correct type, which involves using the stored key type information.[21] (*See* '468 patent at 3:29-32) ("This can be accomplished by retrieving the stored information from storage, selecting a blank key corresponding to the blank type, cutting the blank key according to the bitting pattern, and dispensing the key to the user.")

Claim differentiation further favors KeyMe's position. Claim 7, which depends on claim 1, recites duplicating keys from key blanks, so claim 1's "key shaping device" must also cover the key cutter embodiment. *See Hill-Rom*, 755 F.3d at 1376 ("Under the principles of claim differentiation, the independent claims are presumed to be broader."). Hillman's contention that creating a key from a blank does not necessarily involve the key cutter (*see* D.I. 53 at 68-69) is unavailing because claim 7 does not merely recite any key blanks; it specifically recites key blanks stored in one of a plurality of magazines. (*See* '468 patent, cl. 7) ("The system of claim 1,

---

[21] In addition, under Hillman's proposed construction, the "key shaping device" must "replicate" the bit heights of the key. This construction deviates from the limitations of "using" or "based on" the bit heights in the claim language and reads an embodiment out of the claim scope. The specification discloses correcting flaws of the original key by comparing the bitting pattern of the original key to a database of known bitting specifications and "cut[ting] to [the] factory specifications instead of merely replicating the original key's bitting profile." ('468 patent at 10:66-11:16)

15

wherein the third key is created from a key blank stored in one of a plurality of magazines that are each configured to hold a plurality of key blanks.")

### I. "a shaping tool"[22]

| KeyMe |
|---|
| Plain meaning |
| **Hillman** |
| "a tool to shape a key from material removed from stock" |
| **Court** |
| No construction necessary |

In the context of claims 9 and 27,[23] the specification expressly discloses a computer numerical control ("CNC") device that works with both a key cutter using inventoried blanks (*see* '468 patent at 6:45-7:9) and a device that shapes a key from stock material (*see id.* at 7:35-37). For the same reason given in connection with the previous term, the Court rejects Hillman's proposed construction, which improperly excludes the key cutter from the claim scope. There is no further material dispute to be resolved by a construction.

### III. CONCLUSION

The Court will construe the disputed terms as explained above. An appropriate order follows.

---

[22] This term appears in claims 9 and 27 of the '468 patent.

[23] Both claims 9 and 27 claim a key shaping device comprising a computer numerical control device and a "shaping tool."